## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 19-cv-22195-BLOOM/Louis

PALMETTO 241 LLC, et al.,

     Plaintiffs,

v.

SCOTTSDALE INSURANCE COMPANY,

     Defendant.

_____/

### <u>ORDER</u>

**THIS CAUSE** is before the Court upon Defendant's Motion for Final Summary Judgment and Incorporated Memorandum of Law, ECF No. [31] ("Motion"). Plaintiffs filed a Response to the Motion, ECF No. [39] ("Response"), to which Defendant filed a Reply, ECF No. [43] ("Reply"). The Court has considered the Motion, the Response, the Reply, the record in this case, the applicable law, and is otherwise fully advised. For the reasons set forth below, the Motion is granted in part and denied in part.

### I.      BACKGROUND

On March 23, 2020, Plaintiffs filed the operative Second Amended Complaint ("Complaint"), ECF No. [23]. The Complaint alleges that Defendant issued a homeowners' insurance policy bearing policy number DFS1239756 (the "Policy"), which included coverages for the property located at 241 Palmetto Drive, Miami Springs, Florida 33166 from April 12, 2017 through April 12, 2018. *Id.* at ¶ 7. The Complaint asserts two counts: reformation of contract (Count I) and breach of contract (Count II).

In Count I, the Complaint alleges that Plaintiff Charles Cisneros ("Cisneros") is the manager of Palmetto 241, LLC ("Palmetto"), which entity owned a home located at 241 Palmetto Drive, Miami Springs, Florida 33166 (the "Property"). *Id.* at ¶¶ 9-10. Cisneros, on behalf of Palmetto, entered into an agreement with Defendant to insure the Property, and he paid the premium. *Id.* at ¶¶ 11-12. According to Plaintiffs, the Policy that was issued contained a scrivener's error by misspelling the named insured as 241 Palmetto LLC, which is not an existing entity in Florida. *Id.* at ¶¶ 13-15. The Complaint alleges that the scrivener's error was a mutual mistake and that the intended named insured under the Policy was Palmetto 241, LLC, not 241 Palmetto LLC. *Id.* at ¶¶ 16-17, 19.

In Count II, the Complaint alleges that the Property sustained damages due to Hurricane Irma on or about September 10, 2017. *Id.* at ¶ 22. Plaintiffs allege that they notified Defendant of the damages, complied with all conditions precedent to recover under the Policy, but Defendant refused to pay to replace and/or repair the full amount of damages to the Property. *Id.* at ¶¶ 23-26. In their view, Defendant's actions breached the Policy. *Id.* at ¶ 26.

On April 24, 2020, Defendant filed the instant Motion in which it seeks summary judgment as to Count II. ECF No. [31].

## II.    MATERIAL FACTS

Based on the parties' statements and counterstatements of material facts[1], along with the evidence in the record, the following facts are not genuinely in dispute unless otherwise noted.

---

[1] Defendant filed its Statement of Undisputed Material Facts, ECF No. [30] ("Def.'s SOMF"), and Plaintiffs filed an Opposing Statement of Material Facts, ECF No. [38] ("Pls.' SOMF"), which asserted additional material facts. Defendant did not file a reply statement of material facts to Pls.' SOMF, in violation of Local Rule 56.1(a)(3) and 56.1(b)(3)(A). A party's failure to controvert an opposing statement of material facts deems those facts admitted. *See* L.R. 56.1(c) ("All material facts in any party's Statement of Material Facts may be deemed admitted unless controverted by the other party's Statement of Material Facts[.]" Thus, facts alleged in Pls.' SOMF that Defendant

2

### A.     Hurricane Irma and damage to the property

Defendant issued a dwelling policy of insurance to 241 Palmetto LLC bearing policy number DFS1239756, with effective dates of April 12, 2017 to April 12, 2018, for the property located at 241 Palmetto Drive, Miami Springs, Florida 33166. Def.'s SOMF at ¶ 1. On November 30, 2017, Cisneros reported a claim to Defendant for alleged roof and interior damage resulting from Hurricane Irma with a date of loss of September 10, 2017. *Id.* at ¶ 2. Upon receipt, Defendant retained a field adjuster to conduct an inspection of the Property. *Id.* at ¶ 3. On December 8, 2017, the field adjuster conducted an inspection, *id.* at ¶ 4, and subsequently advised Defendant of his findings and issued an estimate for repairs to the interior. *Id.* at ¶ 5. On January 4, 2018, Defendant issued a check made payable to "241 Palmetto, LLC" in the amount of $1,769.87. *Id.* at ¶ 6. According to Defendant, this amount represented the covered portion of the loss based on the field adjuster's inspection and estimate. *Id.* Plaintiffs subsequently contacted Defendant and informed it that they disagreed with the amount of damage to the interior and Defendant's decision to deny coverage for damage to the roof. *See* Pls.' SOMF at 1 ¶ 6.

On January 11, 2018, Defendant issued its coverage position letter to Cisneros, extending payment for the covered portion of the loss based on the field adjuster's estimate, advising that the field adjuster found cracking to the roofing material due to wear, tear, and deterioration, which are excluded causes of loss under the Policy, and inviting the insured to provide any additional information within thirty days if it believed that the claim should be reconsidered. Def.'s SOMF at ¶ 7.[2] Following Cisneros' disagreement with Defendant's coverage position, Pls.' SOMF at 3

---

failed to address with a reply statement of material fact are deemed admitted.

[2] The coverage letter stated, in relevant part, as follows:

We requested an independent adjuster inspect your property for damages. The

¶ 8, Defendant retained a second field adjuster to conduct a re-inspection of the Property. Def.'s SOMF at ¶ 8. On June 11, 2018, the second field adjuster conducted a re-inspection, advised Defendant of his findings, and issued an estimate for interior damage. *Id.* at ¶ 9. The second field adjuster, Bradyn Valencia, observed damage to the property not noted by the first field adjuster, James Gragg, during his inspection on December 8, 2017, such as damage to the kitchen and utility area. Pls.' SOMF at 5 ¶ 1; 9-10 ¶ 6. There was also a progression of damage to the interior of the Property between the first inspection and the second inspection. *Id.* at 5 ¶ 2.

On June 19, 2018, Defendant sent email correspondence to Cisneros, advising that the re-inspection was conducted and showed there was no wind or hail damage to the roof, and thus, Defendant maintained its position of no coverage for roof damage. Def.'s SOMF at ¶ 10.[3] Following the June 19, 2018 email correspondence, Defendant did not receive further communication from the insured or its representatives until after the initial lawsuit was filed on November 6, 2018. *Id.* at ¶¶ 11-12.[4] In May 2019, Plaintiffs provided Defendant with a contrary damage estimate in the amount of $211,373.51 dated November 3, 2018. *Id.* at ¶ 15.

---

adjuster inspected the exterior of your dwelling and found cracking to your roofing material due to wear, tear and deterioration. The adjuster then inspected the interior and found water damage to the office, bedroom and sunroom ceilings and walls and the sunroom door. This damage was due to rain entering from the deteriorated roof. . . . The adjuster determined the damage to the roof was due to deterioration as seen by the cracks in the roof covering.[] Your policy excludes damages due to wear and tear and deterioration. Therefore, we are unable to make any payment under the terms of your policy for the roof.

Pls.' SOMF at 2 ¶ 7 (quoting ECF No. [27-3]).

[3] The email stated that "[w]e have re-inspected the property at 241 Palmetto Dr. The re-inspection showed there was no wind or hail damage to the roof. Therefore, our decision stands an[d] no other payment is owed." Pls.' SOMF at 3 ¶ 10 (quoting ECF No. [27-4]).

[4] To date, Defendant has received no notification from the insured or its representatives that 241 Palmetto LLC has been unable to cash the January 4, 2018 check that Defendant issued. *Id.* at ¶ 13.

**B.      Potential causes of damage**

Dr. William Yanko, Defendant's expert, concluded that the roof system was replaced after the storm event on September 10, 2017, and that there was no evidence of wind damage to the roof that existed at the time of Hurricane Irma. *Id.* at ¶ 17. His report, more particularly, stated that "[t]he physical evidence observed at the site and prior photographs indicated that the roof system was replaced after the storm event on September 10, 2017. . . . We observed no evidence of wind damage to the roof systems in prior photographs taken on December 11, 2017 and on June 11, 2018." *See* ECF No. [27-5] at 4 ¶ 1.[5] Dr. Yanko concluded that the physical evidence observed at the site and prior photographs indicated that there were long-term (years) and ongoing ponding issues on the roof due to inadequate drainage and debris accumulation at the drainage points (scuppers). Def.'s SOMF at ¶ 18. His report noted that "prior aerial photographs indicated that the ponding was not a recent issue." ECF No. [27-5] at 4 ¶ 2.

He also concluded that the physical evidence observed at the site indicated that there were systemwide cracks in the wall and ceiling finishes associated with long term (years) differential settlement of the foundations. Def.'s SOMF at ¶ 19.[6] Dr. Yanko observed multiple prior leveling repairs in the crawlspace, several of which were improperly installed (missing concrete

---

Likewise, prior to the suit being filed, Defendant received no expert report, damage estimate, or expert opinion rebutting the conclusions of Defendant's investigation. *Id.* at ¶ 14.

[5] Plaintiffs disagree with Dr. Yanko's opinion regarding no evidence of wind damage to the roof. In particular, they assert that Dr. Yanko did not inspect the Property at the same time that the second field inspector, Mr. Valencia, made his report, and that the photographs he relied upon were not close-ups of the roof. *See* Pls.' SOMF at 4 ¶ 17 (citing ECF No. [28-1] at 77:8-21).

[6] Plaintiffs disagree with Dr. Yanko's opinion that the cracking to the wall and ceiling finishes are associated with long-term differential settlement of the foundations. In particular, they assert that the cracking is due to a combination of water coming in through the roof and water accumulating on the roof, which overloaded the roof system. *See* Pls.' SOMF at 4 ¶ 19 (citing ECF No. [28-1] at 55:22-56:6).

foundations under piers, inadequate framing repairs, and inadequate pier construction). *Id.* He testified that it was "absolutely" possible that there was water intrusion during Hurricane Irma, but he explained that the damage worsened following September 10, 2017 because there "is a debris issue at the property and for these types of roof which don't have secondary drainage systems which means you have a scupper and then you have a secondary drainage if the scupper backs up. If you have drainage that clogs the pattern off the roof, you get water build up on the roof and it goes into locations that are not really intended to go. And depending on how the trees and the foliage that falls, the amount of precipitation and the combination of both, you have periods of long time where it's worse." Pls.' SOMF at 6-7 ¶ 5.

On April 9, 2020, Defendant deposed Dr. Eduard Badiu, Plaintiffs' expert, on the cause of damage to the Property. Def.'s SOMF at ¶¶ 20-21.[7] Dr. Badiu concluded that "given the location of the property, all the elements that exist on the property, including but not limited to the heavy foliage and large size trees to the west, . . . it's more likely than not damages to the roof have occurred as part of the interaction between the wind and the wind-borne debris that put, or possibly put, damages or inflicted the damages to the roof, the waterproofing roof system and a sense of scuffs, abrasions, scratches, gouges, cuts, slices, or otherwise creating an opening to the roof system that led to damages or ensuing damages to the interior, as there is clear evidence of that." *Id.* at ¶ 24. He further testified that until the temporary roof had been installed after the storm, the damages at the Property had progressively gotten worse, and that since installation of the Presto

---

[7] During his deposition, he testified his register consultant, Mr. Huzdup, inspected the property on February 3, 2020, and that he and Mr. Huzdup subsequently inspected the Property on April 7, 2020, after he had issued his report on February 25, 2020. *Id.* at ¶ 22. Dr. Badiu did not inspect the interior of the Property at the time of his inspection. *Id.* Neither he nor Mr. Huzdup inspected the crawlspace during the February 3, 2020 or April 7, 2020 inspections. *Id.*

Roofing roof system, no additional water damage has occurred. Pls.' SOMF at 5-6 ¶ 4. He stated that based on his understanding that no damages or interior damages existed prior to Hurricane Irma and that no damages have occurred since the Presto Roofing roof was installed, he opined that the damages to the Property were related to Hurricane Irma. *Id.*

He testified that the problem "is when the roof was overloaded and probably flooded with rainwater or during the hurricane, the roof actually just transformed." Def.'s SOMF at ¶ 25 p. 6. Specifically, "[o]nce the drainage scuppers have been clogged with debris from the adjacent foliage and water had no other means to drain off the roof," the roof began to accumulate water that it was "not designed to carry." *Id.* The "tremendous amount of weight on the roof that no longer could drain" "had a domino effect on the interior finishes, both on the walls and ceilings." *Id.* He estimated that 7 inches of water accumulated on the roof, which caused the roof framing to bear extra weight that is "not part of the original design or not part of [a] design to carry that extra weight." *Id.*

Dr. Badiu, however, testified that he does not have direct evidence that 7 inches of water accumulated on the roof nor that the scuppers had clogged during Hurricane Irma. *Id.* at 6-7. Further, he stated that the roof shape and roof type were not sufficient to hold water for longer than 48 hours, and that once the scuppers get clogged, the "water is going to take a whole lot longer to drain" if the scuppers are not cleaned. *Id.* at 7. He also testified that while a combination of wind-borne debris and rainfall caused damage to the roof, he does not have evidence that wind-borne debris caused damage to the roof "other than what's typical of this type of event[], given the specifics and details of this particular residence, where it's located and what else is on the property." *Id.* at ¶ 26. He concluded that the roof system that was present during Hurricane Irma was finished against the wall with metal flashing and also counter flashing, approximately 2 to 3

inches above the elevation of the existing roof, which installation issues resulted in moisture penetration as well as water streak marks. *Id.* at ¶ 27. According to Dr. Badiu, it is "very likely" that once the height of the water reached the wall terminations, water on the roof "penetrated up and behind the wall flashings, in addition to all the gouges, cuts, slices that might have existed there," and this is "a function of the way the roof was installed." *Id.*

### C.    Relevant policy language

The Policy provides coverage as follows:

**A. Coverage A – Dwelling And Coverage B – Other Structures**

> **1.** We insure against risk of direct physical loss to property described in Coverages **A** and **B**.
> **2.** We do not insure, however, for loss:
> . . .
> **c.** Caused by:
> . . .
>> **(8)** Any of the following:
>>> **(a)** Wear and tear, marring, deterioration**;**
>>> . . .
>>> **(f)** Settling, shrinking, bulging or expansion, including resultant cracking, of bulkheads, pavements, patios, footings, foundations, walls, floors, roofs or ceilings[.]

*See* ECF No. [28-1] at 47-48. The Policy excludes coverage as follows:

**GENERAL EXCLUSIONS**
. . .

> **B.** We do not insure for loss to property described in Coverages A and B caused by any of the following. However, any ensuing loss to property described in Coverages **A** and **B** not precluded by any other provision in this policy is covered.
> . . .
>> **3.** Faulty, inadequate or defective:
>>> a.  Planning, zoning, development, surveying, siting;
>>> b.  Design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;
>>> c.  Materials used in repair, construction, renovation or remodeling; or
>>> d.  Maintenance;

of part or all of any property whether on or off the Described location.

*Id.* at 50-51. The Policy also imposes duties after loss as follows:

> **CONDITIONS**
> . . .
>
> **D.    Duties After Loss**
>
>> **1.**    Give prompt notice to us or our agent, except that a claim, supplemental claim or reopened claim for loss or damage caused by hurricane or other windstorm must be given to us in accordance with the terms of this Policy within three years after the hurricane first made landfall or a windstorm other than hurricane caused the covered damage. (Supplemental claim or reopened claim means an additional claim for recovery from us for losses from the same hurricane or other windstorm which we have previously adjusted pursuant to the initial claim.).
>> . . .
>> **3.**    Cooperate with us in the investigation of a claim.

*Id.* at 17, 51.

### III.    LEGAL STANDARD

A court may grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The parties may support their positions by citation to the record, including, *inter alia*, depositions, documents, affidavits, or declarations. *See* Fed. R. Civ. P. 56(c). An issue is genuine if "a reasonable trier of fact could return judgment for the non-moving party." *Miccosukee Tribe of Indians of Fla. v. United States*, 516 F. 3d 1235, 1243 (11th Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)). A fact is material if it "might affect the outcome of the suit under the governing law." *Id.* (quoting *Anderson*, 477 U.S. at 247-48). The court views the facts in the light most favorable to the non-moving party and draws all reasonable inferences in the party's favor. *Crocker v. Beatty*, 886 F.3d 1132, 1134 (11th Cir.

2018). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which a jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252. The Court does not weigh conflicting evidence. *See Skop v. City of Atlanta, Ga.*, 485 F.3d 1130, 1140 (11th Cir. 2007) (quoting *Carlin Comm'n, Inc. v. S. Bell Tel. & Tel. Co.*, 802 F.2d 1352, 1356 (11th Cir. 1986)).

The moving party shoulders the initial burden to demonstrate the absence of a genuine issue of material fact. *See Shiver v. Chertoff*, 549 F.3d 1342, 1343 (11th Cir. 2008). If a movant satisfies this burden, "the non-moving party 'must do more than simply show that there is some metaphysical doubt as to the material facts.'" *Ray v. Equifax Info. Servs.*, L.L.C., 327 F. App'x 819, 825 (11th Cir. 2009) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). Instead, "the non-moving party 'must make a sufficient showing on each essential element of the case for which he has the burden of proof.'" *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). The non-moving party must produce evidence, going beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designating specific facts to suggest that a reasonable jury could find in the non-moving party's favor. *Shiver*, 549 F.3d at 1343.

In resolving the issues presented under Fed. R. Civ. P. 56, "the court may not weigh conflicting evidence to resolve disputed factual issues; if a genuine dispute is found, summary judgment must be denied." *Carlin Commc'n, Inc. v. Southern Bell Tel. & Tel. Co.*, 802 F.2d 1352, 1356 (11th Cir. 1986); *see also Aurich v. Sanchez*, No. 08-80113-CIV, 2011 WL 5838233, at *1 (S.D. Fla. Nov. 21, 2011) ("If a reasonable fact finder could draw more than one inference from the facts, and that inference creates an issue of material fact, then the court must not grant summary judgment.") (citing *Hairston v. Gainesville Sun Publ'g Co.*, 9 F.3d 913

(11th Cir. 1993)). Even "where the parties agree on the basic facts but disagree about the factual inferences that should be drawn from those facts," summary judgment may be inappropriate. *Warrior Tombigbee Transp. Co., Inc. v. M/V Nan Fung*, 695 F.2d 1294, 1296 (11th Cir. 1983).

Summary judgment is inappropriate where the Court would be required to weigh conflicting renditions of material fact or determine witness credibility. *See Hairston*, 9 F.3d at 919; *see also Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996) ("It is not the court's role to weigh conflicting evidence or to make credibility determinations; the non-movant's evidence is to be accepted for purposes of summary judgment."); *see also Strickland v. Norfolk S. Ry. Co.*, 692 F.3d 1151, 1154 (11th Cir. 2012) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he [or she] is ruling on a motion for summary judgment or for a directed verdict." (quoting *Anderson*, 477 U.S. at 255)); *Gary v. Modena*, No. 05-16973, 2006 WL 3741364, at *16 (11th Cir. Dec. 21, 2006) (Fed. R. Civ. P. 56 precludes summary judgment where court would be required to reconcile conflicting testimony or assess witness credibility); *Ramirez v. Nicholas*, No. 13-60820-CIV, 2013 WL 5596114, at *4 (S.D. Fla. Oct. 11, 2013) ("The Court may not make the credibility determinations needed to resolve this conflict; only the jury may do so.").

Through this lens, the Court considers the Motion and the parties' arguments.

## IV.    DISCUSSION

Defendant moves for summary judgment arguing that the undisputed facts demonstrate that the alleged damage to the roof is not covered under the Policy. ECF No. [29] at 9-15. In particular, the Defendant argues that there is no evidence that the roof sustained damage during the policy period, but even if it did sustain damage during that time, the causes of loss to the roof alleged by Dr. Badiu are not covered under the Policy. *Id.* Additionally, it contends that it did not

breach the contract because it accepted coverage, remitted payment in the amount of $1,769.87 for the loss, and it was not advised of any additional basis for supplemental payment prior to Plaintiffs' filing of the lawsuit. *Id.* at 15-18.

In response, Plaintiffs argue that the Motion should be denied because Defendant failed to seek relief from this Court's Scheduling Order and failed to show good cause for filing a supposedly untimely motion; there are genuine disputes of material fact concerning covered damage to the roof of the Property during the policy period; and there are genuine disputes of material fact concerning Defendant's alleged breach of the Policy prior to Plaintiffs' filing of the instant lawsuit. ECF No. [39]. In its Reply, Defendant asserts that the Motion is timely, Plaintiffs have not established that the roof was damaged during the policy period, and even if so, coverage is excluded; and that the case law it previously cited to establish no breach of contract applies. ECF No. [43]. The Court will address the issues in turn.

### A.    The Motion is timely

Plaintiffs assert that the deadline to file dispositive motions was April 15, 2020 yet the Motion was filed on April 24, 2020, thus making it untimely. ECF No. [39] at 5-6. The Court finds Plaintiffs' argument to be without merit. On March 16, 2020, the Court amended the Scheduling Order and set April 24, 2020 as the deadline for the parties to file all pre-trial motions, including dispositive motions. ECF No. [21]. Because the Motion was filed within that timeline, Plaintiffs' argument is rejected.

### B.    No genuine dispute exists that damage to the roof is not covered

Defendant maintains that the summary judgment record demonstrates that the alleged damage to the roof is not covered by the Policy. Specifically, it cites to Dr. Yanko's report, which concluded that he "observed no evidence of wind damage to the roof systems in prior photographs

taken on December 11, 2017 and on June 11, 2018," and that the physical evidence "observed at the site and prior photographs indicated that there were long-term (years) and ongoing ponding issues on the roof due to inadequate drainage and debris accumulation at the drainage points (scuppers)." ECF No. [27-5] at 4. The report noted that "physical evidence observed at the site indicated that there were systemwide cracks in the wall and ceiling finishes associated with long-term (years) of differential settlement of the foundations," and Dr. Yanko "observed multiple prior leveling repairs in the crawlspace, several of which were improperly installed (missing concrete foundations under piers, inadequate framing repairs, and inadequate pier construction." *Id.* at 5.

Defendant adds that Dr. Badiu's testimony does not establish that the causes of loss to the roof were covered by the policy. In particular, Defendant asserts that Dr. Badiu did not inspect the interior of the Property nor the crawlspace during his April 7, 2020 inspection, and that while he testified that the roof was damaged by a combination of wind-borne debris and rainfall, he stated that, in terms of evidence that wind-borne debris caused damage to the roof, he does not "have anything, other than what's typical of this type of event given the specifics and details of this particular residence, where it's located and what else is on the property." ECF No. [31] at 9-10. Defendant posits that Dr. Badiu could not have observed any alleged wind-debris damage to the roof because it was replaced following Hurricane Irma. *Id.* at 10. Further, regarding rainwater damage to the roof, Defendant contends that Dr. Badiu was unable to provide evidence that water accumulated on the roof during Hurricane Irma even though he testified that the scuppers on the roof were clogged from debris during the storm causing seven inches of rainwater to accumulate on the roof, which resulted in excess weight. *Id.* at 10-11.

Defendant further argues that even if rainwater did accumulate on the roof during the storm, both experts agree that the ponding issue on the roof is the result of installation and design issues.

*Id.* at 11-13. Specifically, Dr. Badiu testified that the roof was "not designed to carry that kind of water," "not part of the original design or not part of [a] design to carry that extra weight," rainwater accumulation is an installation issue because of the roof shape and roof type and was "a function of the way the roof was installed." *Id.* Accordingly, Defendant maintains that there is no coverage for damage to the roof because the Policy excludes losses caused directly or indirectly by faulty, inadequate, or defective design and construction, and that losses caused by wear, tear, marring, or deterioration are not covered under the policy. *Id.* at 14-15.

In response, Plaintiffs assert that because the Policy is an "all-risks" insurance policy, it extends to all losses unless the Policy contains a specific provision expressly excluding the loss from coverage, and that once the insured establishes that damage occurred during the policy period, the burden shifts to the insurer to show that the loss is excluded. ECF No. [39] at 7.[8] In this regard, Plaintiffs argue that they have demonstrated that the roof experienced damage during the policy period,[9] and that Defendant cannot carry its burden to show that the damage is excluded under the terms of the policy. *Id.* at 8. Plaintiffs challenge Dr. Yanko's conclusion that there is no evidence of wind damage to the roof because his opinion was based on a review of photographs taken by the field adjusters, and he inspected the roof after it was temporarily repaired. *Id.* at 9. Additionally, Plaintiffs maintain that while Dr. Yanko observed long-term and ongoing ponding issues on the

---

[8] The Court disagrees with Plaintiffs' characterization of the Policy, ECF No. [27-2]. The Policy does not provide that it is an "all-risks" policy but rather is a "dwelling" policy insuring against "perils" and risk of "direct physical loss to property described in Coverages A and B." *Id.* at 43, 47.

[9] Specifically, Plaintiffs cite evidence that Cisneros stated that the roof did not leak prior to Hurricane Irma, the interior of the Property did not have water damage prior to Hurricane Irma, and the roof began to leak and water began entering the Property following the storm. ECF No. [39] at 7-8. Plaintiffs also cite testimony from Dr. Badiu that it is more likely than not that the roof was damaged during Hurricane Irma, and testimony from Cisneros and Dr. Yanko that the damages to the interior of the Property became progressively worse following the storm. *Id.* at 8.

roof and observed systemwide cracks due to pre-Hurricane Irma foundation settlement issues, Dr. Yanko testified that it was possible that there was water intrusion during Hurricane Irma, and it is undisputed that the Property's interior experienced deterioration following the storm and progressively worsened. *Id.* at 9-10.

Plaintiffs assert that they made roof repairs in December 2018. *Id.* at 10. They add that according to Dr. Yanko, the interior damage worsened following Hurricane Irma because of precipitation, Plaintiffs "changed the roof and the water drainage characteristics changed slightly." *Id.* In their view, "Dr. Yanko has no explanation to shed light on the fact that the interior of the property rapidly deteriorated in the year following Hurricane Irma, yet the roof was not damaged during the storm." *Id.* Further, they note that Dr. Badiu opined that "it was more likely than not that the roof was damaged by wind and wind-borne debris that may have inflicted damages to the roof and waterproofing roof system in the form of an opening which led to ensuing damage to the interior of the property." *Id.* at 11.[10] Thus, according to Plaintiffs, there are "multiple genuine disputes of material fact concerning covered roof damage at the property." *Id.*

In reply, Defendant asserts that Cisneros is not the owner of the Property and that Plaintiffs have not provided evidence that he resided at the property before or during Hurricane Irma or that

---

[10] Plaintiffs purported citation to Dr. Badiu's testimony is inaccurate. Specifically, the Response incorrectly cites to Dr. Yanko's report rather than Dr. Badiu's deposition testimony. *See* ECF No. [39] at 11. But more importantly, the quote they attributed to Dr. Badiu is not properly expressed. Instead, Dr. Badiu testified as follows:

> [I]t's more likely than not damages to the roof have occurred as part of the interaction between the wind and the wind-borne debris that put, or possibly put damages or inflicted the damages to the roof, the waterproofing roof system and a sense of scuffs, abrasions, scratches, gouges, cuts, slices, or otherwise creating an opening to the roof system that led to damages or ensuing damages to the interior[.]

ECF No. [28-1] at 47:11-20.

he otherwise observed the conditions of the roof prior to, during, or after Hurricane Irma. ECF No.

[43] at 3. Additionally, it challenges Dr. Badiu's conclusion regarding wind-related causation as

speculative, lacking in "any sort of scientific basis," and without site-specific evidence. *Id.*

Similarly, Defendant asserts that Plaintiffs' contention that Dr. Yanko has no site evidence to

support that there was no evidence of wind damage to the roof is incorrect because Dr. Yanko

reviewed the field adjusters' photographs of the property taken prior to his site inspection, and he

relied upon historical aerial photographs showing a "large pool of water on the roof" to determine

that there is a long-term ponding issue on the roof. *Id.* at 4.

Defendant further contends that it is immaterial whether the roof was damaged during the

policy period because both parties' experts agree that that the ultimate cause of loss associated

with the roof are installation and design issues. *Id.* at 4-5. In particular, Defendant asserts that

Plaintiffs do not address Dr. Badiu's testimony regarding the accumulation of rainwater on the

roof. *Id.* at 5. According to them, Dr. Badiu's testimony that the rainwater accumulation was a

function of the way the roof was installed is consistent with Dr. Yanko's testimony that the

physical evidence observed at the site and prior photographs indicated that there were long-term

and ongoing ponding issues on the roof due to inadequate drainage and debris accumulation at the

scuppers. *Id.* Thus, Defendant asserts that the Policy's exclusion applies for losses due to faulty,

inadequate or defective design, specifications, workmanship, repair, construction, renovation,

remodeling, grading, compaction; materials used in repair, construction, renovation or remodeling;

or maintenance. *Id.* at 6.

Upon review, the Court agrees with Defendant that the Policy's exclusion for losses due to

faulty, inadequate, or defective design and construction applies. Although the record supports that

there is a genuine dispute as to whether the Property sustained damage during the policy period,

that dispute is of no moment because Plaintiffs have not presented evidence to establish that the damage to the roof would be covered, in view of the policy exclusion, even if damage arose during Hurricane Irma. Specifically, Plaintiffs have not put forth evidence to dispute Dr. Yanko's conclusion that the Property had pre-existing long-term and ongoing ponding issues on the roof due to inadequate drainage and debris accumulation at the drainage points. Dr. Yanko testified that he had aerial photographs that show that ponding issues have been ongoing since 2006 at the Property. *See* ECF No. [35-1] at 27:23-28:4; 40:13-19. He also testified that "[t]here is a debris issue at the property and for these type of roofs which don't have secondary drainage systems which means you have a scupper and then you have a secondary drainage if the scupper backs up. If you have drainage that clogs the pattern off the roof, you get water build up on the roof and it goes into locations that are not really intended to go. And depending on how the trees have foliage that falls, the amount of precipitation and the combination of both, you have can [sic] periods of long time where it's worse." *Id.* at 39:24-40:12.

Dr. Badiu similarly testified that although he did not have direct evidence that seven inches of water accumulated on the roof during Hurricane Irma nor that the scuppers clogged during the storm, he noted that the "roof shape and the roof type" were not "sufficient" to shed water and that it would take "days" to "actually drain off the roof" if the scuppers were not cleaned during the storm. *See* ECF No. [28-1] at 58:9-60:13. Dr. Badiu also testified that the roof was "not designed to carry that kind of water," "when the roof was overloaded and probably flooded with rainwater or during the hurricane, the roof actually just transformed," and that the excess weight on the roof from the accumulated water is a "tremendous amount of weight on the roof that no longer could drain" and that the roof is not "design[ed] to carry that extra weight." *See id.* at 56:10-57:14. Further, Dr. Badiu testified that had the roof covering been a sloped roof, water would have drained

from the roof faster. *See id.* at 59:11-60:13. He also noted that with the roof at issue, "water would accumulate and will actually pond on a rooftop becoming a tub during the hurricane and allowing quite a large bowl of water to be stored on top of the roof," such that water penetration would occur and would be a "function of the way the roof was installed" because the roof was "originally installed with membrane of the wall a certain height and finished with metal components known as metal flashings." *Id.* at 74:11-75:22. Accordingly, the record supports Defendant's contention that no genuine dispute of material fact exists that the alleged damage to the roof is excluded by the Policy. Therefore, Defendant is entitled to summary judgment as to Plaintiffs' claim for damages to the roof.

## C.     Genuine disputes exist whether Defendant breached the Policy

Defendant contends that there is no evidence of breach of contract because it accepted coverage for Plaintiffs' losses, remitted payment for the replacement cost value of the damage to the interior of the Property based on its field adjuster's estimate, and it was not advised by the insured of any additional basis for supplemental payment prior to the filing of Plaintiffs' lawsuit, such as by an estimate, report, or expert opinion. ECF No. [31] at 15. In fact, it asserts that Plaintiffs' estimate was not provided until approximately six months after suit had been filed, and thus, Defendant's decision to pay the amount of its estimate (less the deductible) was consistent with the Policy's terms and its coverage position letter, and thus cannot support a breach of contract claim. *Id.* at 15-17 (citing *Slayton v. Universal Prop. & Cas. Ins. Co.*, 103 So. 3d 934 (Fla. 5th DCA 2012)).

In response, Plaintiffs maintain that Defendant breached the policy by refusing to provide coverage for the roof damages and by refusing to pay for all interior damages at the Property. ECF No. [39] at 11. Additionally, they argue that under Florida law, they are not obligated to provide

contrary estimates, reports, or expert opinions to Defendant prior to filing a lawsuit if a valid dispute has arisen. *Id.* Finally, they argue that Defendant's reliance on *Slayton*, 103 So. 3d 934, is distinguishable based on the facts of this case. In the Reply, Defendant asserts that the rationale of *Slayton* applies to the instant case. ECF No. [43] at 6-7. The Court will address each issue in turn.

### i.     No genuine dispute that Defendant did not breach the Policy by refusing to provide coverage for the damages to the roof

Plaintiffs assert that Defendant breached the Policy by refusing to pay for the allegedly covered damage to the roof. ECF No. [39] at 13-14. According to Plaintiffs, Defendant breached the Policy on January 11, 2018 when it issued its coverage letter to Cisneros denying coverage for roof damage and on June 19, 2018 when it reaffirmed its decision. *Id.* at 14. However, because the Court has determined that there is no coverage for damages to the roof, Plaintiffs' argument lacks merit.

### ii.     A genuine dispute exists whether Defendant breached the Policy by refusing to pay for all interior damage to the Property

Plaintiffs assert that Defendant breached the Policy by choosing to not pay for all interior damages. In particular, they claim that they presented additional interior damage to Defendant following its initial payment of $1,769.87, but Defendant refused to make further payment for these damages even though it became aware of damages not observed during the initial December 7, 2017 inspection.  ECF No. [39] at 14. According to Plaintiffs, during Defendant's re-inspection of the Property on June 11, 2018, Mr. Valencia observed damage to the interior of the Property that was not noted by Mr. Gragg, the first field adjuster, yet on June 19, 2018, Defendant sent an email stating that "our decision stands an[d] no other payment is owed." ECF No. [39] at 14-16 (citing ECF No. [27-4]). Plaintiffs, therefore, argue that Defendant's refusal to pay for the additional interior damage violated the Policy. *Id.* at 16. Upon review, the Court finds that a

genuine dispute exists as to whether Defendant's actions in failing to make additional payments for interior damage breached the Policy.

> Defendant's January 11, 2018 coverage position letter stated as follows:
>
> The Company reserves the right to review any additional claims or amendments to this claim and to make a separate determination as to whether a new claim or amendment to this claim is covered by the policy. Any decision we make regarding coverage is based on the facts as presented to us prior to our coverage determination and should not be construed as applicable to a new claim or an amendment to this claim. Our right to have notice of either situation is reserved, as are the notice conditions of the policy. . . . If you believe there is additional information that should be considered or some other reason your policy should provide coverage, please provide that information in writing within 30 days of receipt of this letter.

ECF No. [27-3] at 2. Dissatisfied with Defendant's coverage decision, Cisneros subsequently contacted Defendant and "informed them the interior had more damage than could be repaired with $1,769.87." ECF No. [37-1] at ¶ 12. This communication prompted Defendant to send Mr. Valencia to reinspect the Property on June 11, 2018. ECF No. [27-1] at ¶¶ 12-13. Although Defendant asserts that it "never took the position that no further payment would be considered," ECF No. [31] at 15, the June 19, 2018 email demonstrates otherwise. Notably, the record does not reflect that Plaintiffs would not have been entitled to additional payments based on Mr. Valencia's observations. Specifically, Defendant's email made no reference to Mr. Valencia's findings as to the Property's interior, but rather only to alleged damage to the roof. ECF No. [27-4]. Mr. Valencia's estimate of the total damages to the Property, which included damages to the kitchen and utility room (which were not included in Mr. Gragg's estimate), was $4,011.26. ECF No. [36-1] at 24:13-25. Further, there was a progression of damages to the Property's interior between December 8, 2017 and June 11, 2017. Pls.' SOMF at 5 ¶ 2. Therefore, construing the evidence in the light most favorable to Plaintiffs, a genuine dispute of material fact exists as to whether Plaintiffs were entitled to further payments for interior damages to the Property.

Defendant appears to argue that it performed under the Policy's terms because it tendered payment to Plaintiffs pursuant to *Slayton*[11] and that prior to suit, Plaintiffs did not provide it with documentation of repairs, an engineering report, or expert opinion. ECF No. [31] at 15-17. The Court finds Defendant's arguments to be unconvincing. First, unlike *Slayton*, Plaintiffs requested a re-inspection of the Property, and the re-inspection revealed evidence of damages that were not observed initially. Yet, Defendant did not change its coverage position. Second, Defendant points to no language in the Policy that requires the insured to provide it with an estimate, report, or expert opinion once Defendant refused to pay the claim. *See Citizens Prop. Ins. Corp. v. Munoz*, 158 So. 3d 671, 673-74 (Fla. 2d DCA 2014) (trial court properly denied insurer's motion for directed verdict because the insureds "were under no obligation to provide a contrary report to Citizens before filing suit," "a valid dispute about the existence of a covered loss under the insurance policy arose at the time Citizens denied coverage," and "Citizens has failed to point to any legal authority or any portion of the policy requiring the [insureds] to have given Citizens a contrary report prior to filing suit"). Summary judgment, therefore, is inappropriate on whether Defendant breached the Policy by not providing full coverage for interior damages to the Property.

---

[11] In *Slayton*, an insured's home suffered windstorm damage, and the property insurer paid only the amount it estimated as the cost to repair the damages rather than the higher amount estimated by the insured's public adjuster. 103 So. 3d at 935-36. Before the insured filed suit, the insurer tendered a check and notified the insured in writing that "the amount of $27,915.87 does not necessarily constitute a full and final settlement of your claim for damages associated with your claimed loss" and that the insured could "submit supplemental claims for any damages discovered in the covered reconstruction and repair of the above mentioned property." *Id.* at 936. The insured negotiated the check but did not submit any supplemental claims prior to filing suit. *Id.* At trial, the insurer moved for a directed verdict on the basis that "its decision to pay the amount of its estimate (less the deductible) and then consider supplemental claims for additional damages discovered during or arising from the repairs was consistent with the terms of its insurance policy." *Id.* The trial court granted the directed verdict and concluded that the insurer did not fail to comply with the policy's terms. On appeal, the court affirmed and found that the insurer's "argument had merit." *Id.*

## IV.    CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** that the Motion, **ECF No. [31]**, is **GRANTED IN PART AND DENIED IN PART**.

**DONE AND ORDERED** in Chambers at Miami, Florida, on May 26, 2020.

**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

Copies to:

Counsel of Record